**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| HENRY JOHS, MIKE HUDSON, | ) | **CLASS ACTION COMPLAINT** |
| MARJEAN CODDON, and GREG | ) | |
| BEASTROM, individually and on behalf of | ) | **JURY TRIAL DEMANDED** |
| all others similarly situated, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| HICKORY SPRINGS MANUFACTURING | ) | |
| COMPANY, VALLE FOAM INDUSTRIES, | ) | |
| INC., DOMFOAM INTERNATIONAL, INC., | ) | |
| THE CARPENTER COMPANY, | ) | |
| WOODBRIDGE SALES & ENGINEERING, | ) | |
| INC., FLEXIBLE FOAM PRODUCTS, INC., | ) | |
| SCOTTDEL, INC., FOAMEX INNOVATIONS, | ) | |
| INC., FUTURE FOAM, INC., VITAFOAM | ) | |
| PRODUCTS CANADA LIMITED, and | ) | |
| VITAFOAM, INC., | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiffs, by and through their attorneys, bring this civil action for damages, injunctive relief, disgorgement, restitution, attorneys' fees and costs of suit, on behalf of themselves and all others similarly situated, who indirectly purchased polyurethane foam in the United States, as defined below, from any of the above-named Defendants, their predecessors, or their controlled subsidiaries and affiliates, at any time between January 1, 1999, and the present (the "Class Period"). Plaintiffs, upon personal knowledge as to their own acts and status, and upon information and belief as to other matters, allege the following:

<u>**INTRODUCTION**</u>

1.      Plaintiffs bring this class action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief for Defendants' violations of Section 1 of the Sherman Act, 15

U.S.C. §1, to recover damages and obtain equitable, injunctive and other relief under state antitrust and/or consumer protection laws and common law, and to recover the costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and all others similarly situated sustained as a result of Defendants' wrongful acts.

2.      As alleged more fully herein, this case arises out of a conspiracy among Defendants (including Defendants' predecessors and/or their controlled subsidiaries and affiliates) and/or their co-conspirators to fix the prices of polyurethane foam and polyurethane foam products (hereinafter "polyurethane foam"), and is brought as a class action on behalf of all persons who, from at least as early as January 1, 1999, to the present (the "Class Period"), purchased polyurethane foam indirectly from one or more of Defendants or their co-conspirators contained in the following products:  a) mattresses; b) carpet padding; c) spray foam insulation ("SPF"); and/or d) furniture.  During the Class Period, and possibly earlier, Defendants conspired to fix, raise, maintain and/or stabilize prices of polyurethane foam by the means and mechanisms alleged herein.  Further, during the Class Period, Defendants agreed to allocate polyurethane foam customers in specific communications between each other.

3.      During the Class Period, Plaintiffs indirectly purchased polyurethane foam from Defendants (including Defendants' predecessors and/or their controlled subsidiaries and affiliates) and/or co-conspirators in the following products, for end use and not for resale:  a) mattresses; b) carpet padding; c) spray foam insulation ("SPF"); and d) furniture.  The prices that Plaintiffs paid for the aforementioned products containing polyurethane foam (mattresses, carpet padding, spray foam insulation and furniture) were greater than the prices they would have paid absent the conspiracy among Defendants and their co-conspirators alleged herein.

4.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the Class (defined below) have paid unlawful, artificially inflated prices for

polyurethane foam, than they would have paid in a competitive market, and therefore, have suffered injury.

5. Plaintiffs assert their claims individually and on behalf of all indirect purchasers who, during the Class Period, indirectly purchased the aforementioned categories of products containing polyurethane foam (mattresses, carpet padding, spray foam insulation and/or furniture), from Defendants (including Defendants' predecessors and/or their controlled subsidiaries and affiliates) and/or co-conspirators.

## JURISDICTION AND VENUE

6. The Court has jurisdiction over the federal claim under 28 U.S.C. §§1331 and 1337. The Court has jurisdiction over the state law claims under 28 U.S.C. §1367 because those claims are so related to the federal claim that they form part of the same case or controversy. The Court also has jurisdiction over the state law claims under 28 U.S.C. §1332(d) because the amount in controversy for the Class described herein exceeds $5,000,000.00, exclusive of interests and costs, and there are members of the Class who are citizens of a different state than Defendants.

7. Venue is proper in this District under 15 U.S.C. §22 and 28 U.S.C. §1391 because Defendants reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

## EFFECTS ON INTERSTATE AND INTRASTATE COMMERCE

8. Defendants and their co-conspirators conduct business throughout the United States, and they have purposefully availed themselves of the laws of the United States. Throughout the Class Period, there has been a continuous and uninterrupted flow of polyurethane foam sales by Defendants in interstate commerce throughout the United States, and Defendants

3

and their co-conspirators have each used instrumentalities of interstate commerce. Defendants' activities have and had a direct, substantial and reasonably foreseeable effect on such commerce.

9.     The conduct of Defendants and their co-conspirators, as described herein, has taken place in, and affected the continuous flow of interstate trade and commerce of the United States.   In furtherance of the conspiracy alleged herein, Defendants have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail.

10.     The conspiracy alleged herein has affected billions of dollars of commerce. Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by Plaintiffs, Class members and other persons.

11.     Further, Defendants' conspiracy substantially affected commerce in each of the states identified herein.  Defendants have purposefully availed themselves of the laws of each of the states identified herein in connection with their activities related to the pricing of polyurethane foam.   Defendants produced, promoted, sold, marketed, and/or distributed polyurethane foam in each of the states identified herein, thereby purposefully profiting from access to indirect purchasers in each such state.  As a result of the activities described herein, Defendants:

    a.  Caused tortious damage to residents of the states identified herein;

    b.  Caused tortious damage in each of the states identified herein by acts or omissions committed outside each such state by regularly doing or soliciting business in each such state;

    c.  Engaged in persistent courses of conduct within each such state and/or derived substantial revenue from the marketing of polyurethane foam in each such state (and services relating to such marketing); and

    d.  Committed acts or omissions that they knew or should have known would

cause damage (and did, in fact, cause such damage) in each such state while regularly doing or soliciting business in each such state, engaging in other persistent courses of conduct in each such state and/or deriving substantial revenue from the marketing of polyurethane foam (and services relating to such marketing) in each such state.

12.     The conspiracy described herein affected adversely every person in each of the states identified in this Complaint who indirectly bought polyurethane foam for end use and not for resale.  Defendants' conspiracy has lasted for many years and resulted in monetary damages to purchasers in each state identified herein.

13.      Prices of polyurethane foam in each state can be manipulated by conspirators within that state, outside of it, or both.  Without enforcing the antitrust and/or consumer protection laws of each of the states identified herein, companies that break the law will go unpunished.  Defendants knew that commerce in each of the states identified herein would have to be adversely affected in order to implement their conspiracy.

## **PLAINTIFFS**

14.     Plaintiff Henry Johs ("Johs"), a Tennessee resident and citizen, indirectly purchased polyurethane foam from one or more of Defendants and/or their co-conspirators during the Class Period, for end use and not for resale, and was injured and/or damaged as a result of Defendants' illegal conduct.   Specifically, Johs purchased mattresses containing polyurethane foam during the Class Period.

15.     Plaintiff Mike Hudson ("Hudson"), a Tennessee resident and citizen, indirectly purchased polyurethane foam from one or more of the Defendants and/or their co-conspirators during the Class Period, for end use and not for resale, and was injured and/or damaged as a

5

result of Defendants' illegal conduct.  Specifically, Hudson purchased spray foam insulation ("SPF") containing polyurethane foam during the Class Period.

16.     Plaintiff Marjean Coddon ("Coddon"), a Tennessee resident and citizen, indirectly purchased polyurethane foam from one or more of Defendants and/or their co-conspirators during the Class Period, for end use and not for resale, and was injured and/or damaged as a result of Defendants' illegal conduct.  Specifically, Coddon purchased furniture containing polyurethane foam during the Class Period.

17.     Plaintiff Greg Beastrom ("Beastrom"), a California resident and citizen, indirectly purchased polyurethane foam from one or more of the Defendants and/or their co-conspirators during the Class Period, for end use and not for resale, and was injured and/or damaged as a result of Defendants' illegal conduct.  Specifically, Beastrom purchased a mattress and furniture containing polyurethane foam during the Class Period.

## DEFENDANTS

18.     Defendants are competitors in the manufacturing and sale of polyurethane foam.

19.     Defendant Hickory Springs Manufacturing Company ("Hickory Springs") is a North Carolina corporation with its headquarters located at 235 2nd Avenue, NW, Hickory, North Carolina  28601.  During the Class Period, Hickory Springs directly sold polyurethane foam throughout the United States.

20.     Hickory Springs is one of the nation's largest integrated component manufacturers and suppliers for the furniture and bedding industries with more than 60 operating facilities in the United States and throughout the world.  The furniture industry is the largest segment of Hickory Springs' customer base.  With more than 160 flexible polyurethane foam formulations, Hickory Springs is one of the United States' largest producers of polyurethane foam.

6

21.     Defendant Valle Foam Industries, Inc. ("Valle") is a privately owned and operated corporation with its headquarters located at 4 West Dr., Brampton, Ontario L6T 2H7 Canada.  During the Class Period, Valle directly and/or through control of its affiliates sold polyurethane foam throughout the United States.

22.     Valle manufactures slab stock polyurethane foam for the furniture, bedding, packaging, carpet and children's toy industries.

23.     Defendant Domfoam International, Inc. ("Domfoam") is a subsidiary of Valle Foam Industries, with its headquarters located at 8785 Langelier Blvd., Montreal, Quebec, H1P 2C Canada.  During the Class Period, Domfoam sold polyurethane foam throughout the United States.

24.     Domfoam is a manufacturer/wholesaler of sponge and polyurethane foam.  Since its incorporation in 1963, Domfoam has grown to be Canada's leading and most diversified manufacturer of ether, ester, rebounded flexible polyurethane foams and visco elastic foam.  According it to its website, "[i]n its 260,000 square-foot Montreal plant, Domfoam services the demanding urethane market in Canada and in the USA by meeting the toughest industry standards and requirements."  Domfoam provides foam for the following purposes:  mattresses, sponge foam blocks, carpet cushion, pillows, bolsters, convolute, furniture foam, toppers, antistatic foam, anti-microbial foam, visco-elastic foam, camping foam, and sporting goods.

25.     Defendant The Carpenter Company ("Carpenter") is a privately owned and operated company with its headquarters located at 5016 Monument Avenue, Richmond, Virginia 23230.  Carpenter operates from approximately 30 locations in the United States, 5 locations in Canada and approximately 20 locations in Europe.  During the Class Period, Carpenter directly sold polyurethane foam throughout the United States.

26. Carpenter is the largest manufacturer of polyurethane foam cushioning in the world. It has divisions in the following areas: air filter media, bedding, carpet cushion, chemicals, chemical systems, consumer products, expanded polystyrene systems, flexible foam packaging furniture, molded manufacturing, polyester fiber, and tire products.

27. Defendant Woodbridge Sales & Engineering, Inc. ("Woodbridge") is a Canadian corporation with its headquarters located at 4240 Sherwoodtowne Blvd., Mississauga, Ontario, L4Z 2G6, Canada. During the Class Period, Woodbridge directly sold polyurethane foam throughout the United States.

28. Woodbridge's primary focus is supplying foam for automotive components, but also supplies other sectors including: commercial and recreational transportation, building products, construction, packaging and several consumer and industrial markets.

29. Defendant Flexible Foam Products, Inc. ("Flexible Foam") is a privately owned and operated Ohio company with its headquarters located at 12575 Bailey Road, Spencerville, Ohio 45887 and has operations in Texas, Indiana, Florida and Wisconsin. It is a subsidiary of Ohio Decorative Products, Inc., also of Spencerville, Ohio. During the Class Period, Flexible Foam directly sold polyurethane foam throughout the United States.

30. Flexible Foam manufactures polyurethane foam and rebond products for customers in the bedding, flooring, furniture, packaging, and automotive industries.

31. Defendant Scottdel, Inc. ("Scottdel") is a privately held corporation with its headquarters located at 400 Church Street, Swanton, Ohio 43558. During the Class Period, Scottdel directly sold polyurethane foam throughout the United States.

32. Scottdel began manufacturing bonded urethane carpet cushion in 1961 and manufactures a complete line of commercial and residential bonded urethane cushions ranging in density from 3.5 pounds to 10 pounds per cubic foot.

33.    Defendant Foamex Innovations, Inc., formerly known as Foamex International, Inc. ("Foamex"), is a privately owned and operated company with its headquarters located at Rose Tree Corporate Center II, 1400 N. Providence Road, Suite 2000, Media, Pennsylvania 19063-2076.  During the Class Period, Foamex sold polyurethane foam throughout the United States.

34.    Foamex provides foam for the home, healthcare, electronics, industrial, personal care and transportation markets.  Its foam is used in automotive cushioning, shipping packages, beds and furniture, as well as personal electronics.  Foamex also provides components for filters, dispensers, gaskets and seals in everything from blood oxygenators to computer disk drives.

35.    Defendant Future Foam, Inc. ("Future Foam") is a privately owned and operated company with its headquarters located in 1610 Avenue N, Council Bluffs, Iowa 51501.  During the Class Period, Foamex sold polyurethane foam throughout the United States.

36.    Future Foam produces foam products for bedding, foam blocks, carpet cushion, furniture, and packaging.

37.    Defendant Vitafoam Products Canada Limited ("Vitafoam Canada") is a privately owned and operated company with its headquarters located at 150 Toro Road, North York, Ontario M3J 2A9, Canada.  During the Class Period, Vitafoam sold polyurethane foam, either directly or through its affiliates, throughout the United States.

38.    Vitafoam Canada manufactures all types of flexible polyurethane foam for use in furniture, bedding and automotive applications, including packaging, medical, industrial and a full range of memory foams.  It also produces latex mattresses and toppers.

39.    Vitafoam, Inc. ("Vitafoam Inc.") is a privately owned and operated company with its headquarters located a 2215 Shore Drive, High Point, North Carolina  27263.  During the Class Period, Vitafoam Inc. sold polyurethane foam, either directly or through its affiliates,

throughout the United States.  Collectively, Vitafoam Canada and Vitafoam Inc. are referred to herein as Vitafoam.

40.     Vitafoam manufactures plastic netting, automotive products, general trade, and nonwoven products.  It produces mattresses and pads, convoluted pads, wheelchair components, and protective packaging for medical supplies, as well as positioning and support wedges, and immobilizing devices, such as neck bracing pillows for the home and commercial healthcare industries.  The company offers polyurethane foam products for packaging, furniture, and upholstery industries; marine industry products, such as fenders, drainable boat seats, waterproof cushions, air circulation pads, and filtration devices; and foam for fabric producers, laminators, trim companies, and original equipment manufacturers in the automotive industry.  It also provides laminating materials, such as fabrics, flexible polyurethane foam, nonwoven webs, films, and other substrates, as well as carpet underlay for residential and commercial sectors. Vitafoam also serves medical, marine, technical, bedding, lamination, and carpet underlay industries.

## CO-CONSPIRATORS AND AGENTS

41.     Other natural persons, corporations, and entities not named as Defendants herein, have participated in the unlawful conspiratorial activity alleged herein in violation of the antitrust laws of the United States, state antitrust laws, state consumer protection laws and/or were unjustly enriched by Defendants' conduct.

42.     Whenever in this Complaint reference is made to a statement or transaction of any corporation or entity, the allegation means that the corporation or entity acted, stated, or transacted by or through its directors, members, partners, officers, employees, or agents, while they were engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within the scope of their authority.

## FACTUAL ALLEGATIONS

### The Polyurethane Foam Market

43.     Polyurethane foams are used to insulate objects or reduce shock. Specifically, polyurethane foams are used in bedding, packaging, seat cushioning, carpet cushioning, shipping pads and shipping cushioning, car interiors, fluid filtration systems, anti-noise and vibration systems in aircraft, medical devices, and in a number of consumer applications.

44.     Polyurethane foam refers to different types of foam consisting of polymers made of molecular chains bound together by urethane links.  It can be flexible or rigid, but generally has a low density.

45.     Flexible polyurethane foam is most often used in bedding and upholstery, while the more rigid variety is used for thermal insulation products and in automobile dashboards. Microcellular foam may be used to make car steering wheels or line the insides of athletic helmets.  Elastomeric foam is typically used to make the outer sole of many types of footwear, including athletic shoes.

46.     The four classes of polyurethane foam, all with different physical properties, are created by varying a basic polymerization reaction involving a diol or polyol, a diisocyanate, and water.

47.     The diisocyanate reacts with the diol or polyol to create the urethane polymer. Water reacts with some of the isocyanate groups to produce carbon dioxide gas, and the bubbles get trapped in the viscous liquid as it polymerizes, expands, and solidifies.  Catalysts and surfactants can be added to boost the reactions and control the foaming process. A wide range of other additives, including stabilizers, dyes, fire retardants, and fungicides, may be added to meet specific performance demands.  Auxiliary blowing agents, such as hydrofluorocarbons, liquid carbon dioxide, and acetone, are also typically used to prepare the foam.  Ultimately, the kinds

and amounts of raw materials used in the manufacturing process help determine how the final product performs.

48.    To manufacture foam for cushioning, two basic procedures are used.  In one, the chemical mix is poured onto a moving conveyor, where it is allowed to react and expand.  Sides on the conveyor allow the foam to rise into a "bun" or slab anywhere from two to four feet high. The continuous slab is then cut, stored, and allowed to cure for up to 24 hours.  This manufacturing procedure is the "slabstock" production process. The cured foam is subsequently fabricated into useful shapes. Most foams for use in furniture and bedding are produced this way.

49.    A second method, foam molding, is a process where individual items are produced by pouring foam chemicals into specially shaped molds and allowing the foam reaction to take place. This process is used primarily for automotive cushioning (such as seats, armrests, and headrests), although some contract furniture utilizes molded cushions. This foam is sometimes referred to as "semi-flexible."

50.    Flexible foams have mainly open cells, formed by gas bubbles that have popped. Air can pass through the foam easily, resulting in a soft, resilient, flexible material. In rigid foams, most of the cells stay closed.  The material is thus harder and less resilient.  Controlling the proportion of open cells to closed cells during the production process is one of the ways that the properties of foam can be manipulated, adding to the material's versatility.

51.    Flexible foam is widely used for its favorable qualities: it is light weight, resilient, quiet, low odor and resistant to mildew and other triggers of common allergies.  Flexible foam may also be molded and cut.  More than 1.2 billion pounds of foam are produced and used every year in the U.S.

52.    Rigid polyurethane foam has many relevant applications in construction.  Many odd and detailed shapes such as sculptures and domed ceilings are far easier to make with foam

than with wood.  Some manufacturers sell specialty rigid foam that is used to replace wood in carved signs and three-dimensional topography models.  It is also used as home insulation, rigid boat hulls, tennis racket grips, and surfboards.

53.     There are few acceptable alternatives for polyurethane foam.  In furniture and bedding applications, short staple polyester fiber or cotton may be used, but both alternative materials have poor height recovery characteristics after compression.  Steel springs also recover well, but must be insulated from the user with some type of cushioning material.  According to the Polyurethane Foam Association, "comparing [polyurethane foam] to alternative materials in the areas of economics, comfort potential, ease of use, and durability, there is not an acceptable substitute for polyurethane foam."

54.     In 2010, domestic revenue for the polyurethane foam industry is expected to be approximately $12 billion.  Furniture and furnishings account for approximately 36.7% of industry revenue.  The major products in this segment include pillows, seating, cushioning, mattress cores and quilt rolls.  Transportation products account for approximately 19.1% of the industry revenue.   This segment includes foam used for automotive seating, protective cushioning and sound insulation in cars and light trucks.  Building and construction account for approximately 12% of industry revenue.  Packaging products account for approximately 5.3% of industry revenue.   Major packaging products include protective shipping pads and food containers.

55.     The polyurethane foam market in Canada and North America is highly concentrated with Defendants controlling a substantial majority of the market share.  Price is the primary factor driving customer choice between different polyurethane foam manufacturers.

56.     New entrants to the polyurethane foam industry face substantial barriers to entry, including start-up capital, patents, licensing, research facilities to develop a comparable quality

and range of products, securing a source of supply for the required chemicals, long-term contracts between Defendants and customers, and a large distribution channel.

57.     Further, there has been a recent trend towards consolidation within the industry. Major players within this industry have been active in acquiring smaller companies and other competitors over the course of the last ten years.  For example, in 2007, Defendant Carpenter acquired its European competitor, Dumo NV.  Carpenter owns approximately 16.3% of the market share in this industry.

58.     After its parent corporation was acquired in 2006, Vitafoam Inc. sold one plant to Olympics Product, LLC, a joint venture between Woodbridge and Hickory Springs.  It sold another plant to Flexible Foam Products.

59.     Defendants alleged here to be participants in the conspiracy are most of the major North American polyurethane foam producers representing a significant portion of the United States market. There are virtually no imports of products in this industry due to the prohibitive freight costs involved in transporting these bulky, low unit priced products over long distances.

## Government Investigation

60.     On or about July 27, 2010, it was publicly disclosed that the FBI, as part of a multi-jurisdictional investigation of polyurethane foam manufacturers, raided the offices of Defendant Carpenter and its competitors, seized documents and shuttered certain of Carpenter's offices.

61.     For the FBI to obtain search warrants, as it appears that it did against Defendant Carpenter and other Defendants, the United States must demonstrate to a Magistrate Judge that probable cause exists, recounted in a sworn affidavit or testimony grounded on reasonably trustworthy information, that it would obtain evidence of an antitrust violation as a result of executing the search warrant.  That is, the United States had to have evidence sufficient to

warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations.

62.     The FBI raid lends further support to the allegations of anticompetitive conduct in the market for polyurethane foam.

## Defendant Vitafoam's Admission of a Conspiracy

63.     During June 2010, it was reported that the South African competition authorities were bringing charges against numerous chemical companies, including Defendant Vitafoam's South African corporate affiliate, for engaging in the price-fixing of and allocation of customers of polyurethane foam.

64.     In 2010, Vitafoam voluntarily approached the U.S. Department of Justice ("DOJ"), Antitrust Division, to self-report evidence of illegal antitrust activities amongst itself and other companies and individuals in the North American polyurethane foam industry ("competitors"), and to seek acceptance into the Antitrust Division's Corporate Leniency Program.

65.     As a result of its application, Vitafoam has received a conditional leniency letter from the DOJ's Antitrust Division.  This fact, in and of itself, is significant.  It means that Vitafoam has admitted to participation in a conspiracy to violate the antitrust laws.  The significance of obtaining a conditional leniency letter was explained by Scott D. Hammond, Deputy Assistant Attorney General for Criminal Enforcement, in a November 19, 2008 presentation available on the DOJ's website:

> *Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?*
>
> Yes.  The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction.  Thus, *the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging,*

15

*capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter.*  Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

When the model corporate conditional leniency letter was first drafted, the Division did not employ a marker system.  Thus, companies received conditional leniency letters far earlier in the process, often before the company had an opportunity to conduct an internal investigation.  However, the Division's practice has changed over time.  The Division now employs a marker system, and the Division provides the company with an opportunity to investigate thoroughly its own conduct.  While the applicant may not be able to confirm that it committed a criminal antitrust violation when it seeks and receives a marker, by the end of the marker process, *before it is provided with a conditional leniency letter, it should be in a position to admit to its participation in a criminal violation of the Sherman Act*.  The Division may also insist on interviews with key executives of the applicant who were involved in the violation before issuing the conditional leniency letter.  *A company that argues that an agreement to fix prices, rig bids, restrict capacity, or allocate markets might be inferred from its conduct but that cannot produce any employees who will admit that the company entered into such an agreement generally has not made a sufficient admission of criminal antitrust violation to be eligible for leniency.  A company that, for whatever reason, is not able or willing to admit to its participation in a criminal antitrust conspiracy is not eligible for leniency.*  Previously the model conditional leniency letters referred to the conduct being reported as "*possible* [...price fixing, bid rigging, market allocation] or other conduct violative of Section 1 of the Sherman Act." (emphasis added).

http://www.usdoj.gov/atr/public/criminal/239583.htm.

66.    Upon information and belief, Vitafoam's co-conspirators include the other Defendants named herein.

### The Conspiracy to Fix Prices and Allocate Customers

67.    Defendants and their co-conspirators have engaged in contracts, combinations, trusts or conspiracies, the effect of which was to raise and/or stabilize the prices at which they sold polyurethane foam to artificially-inflated and supra-competitive levels.

16

68.     Defendants, through their officers, directors and employees, effectuated these contracts, combinations, trusts or conspiracies between themselves and their co-conspirators by, among other things:

    a.    participating in meetings and conversations, including through various trade associations consortiums, and working groups, to discuss the prices of polyurethane foam in the United States;

    b.    agreeing, during those meetings and conversations, to charge prices at specified levels and otherwise to increase and maintain prices of polyurethane foam sold in the United States;

    c.    issuing price announcements and quotations in accordance with the agreements reached; and

    d.    selling polyurethane foam in the United States at supra or non-competitive prices.

69.     On June 8, 2010, it was reported that Troy Carelse of Loungfoam (Pty) Ltd., a polyurethane foam supplier, provided a statement that since 1999 – 2000 other polyurethane foam suppliers within the polyurethane foam industry in Europe and South Africa were engaged in price-fixing and customer allocation schemes.  One of the alleged co-conspirators, Foaming Carpets (Pty) Ltd. was, during the relevant period, Defendant Vitafoam's South African corporate affiliate.

70.     During July 2010, the European Union's competition authorities raided the corporate offices of several polyurethane foam manufacturers located in Austria, Belgium, and the United Kingdom.

71.     A former President of Vitafoam, who worked for Vitafoam from the 1960s until

October 2008, along with other individuals from Vitafoam, directly participated in the long-running price fixing and customer allocation conspiracy alleged herein relating to polyurethane foam sold in North America.

72.     Another Vitafoam employee, a former Vice President of Sales and Marketing for Vitafoam, worked in the polyurethane foam industry from 1963 until March 2009.  He first worked for Woodbridge, and then in 1973 joined Vitafoam's predecessor, Pre-Fab Cushioning Products.  This former vice president worked for Vitafoam in Canada until March 2009 when he retired.  He, along with other individuals at Vitafoam, as well as other companies, had been involved in a long-running price fixing and customer conspiracy that included North America and the United States.

73.     The impetus for the conspiratorial conduct was ordinary and typical increases in raw material costs.  Defendants (or "foamers" as they are referred to at times in the industry) utilize chemicals including polyols and toluene diisocyanate (or "TDI") in the manufacturing of polyurethane foam.  When Defendants' raw material suppliers announced price increases for chemical ingredients of foam, such as polyols and TDI, the foamers contacted each other.  During the communications, Defendants discussed supporting specific price increases and the timing of announcements regarding an effective date of such increases.  The former president of Vitafoam has knowledge that this type of concerted activity has gone on for at least 20 to 25 years.

74.     During this period, there was an understanding and agreement among the competitors in the foam industry to collectively support price increases.  This understanding and agreement was reached in actual discussions among competitors about the percentage of price increases, the dates of the increases, and how the conspirators would announce the increases

often with the same effective dates.  Price increase announcement letters were then mailed to customers, reflecting the prices determined by the conspirators.

75.     Vitafoam had a "policy" of not having conversations with competitors, but this policy was merely window-dressing and was not followed in practice.

76.     As part of the conduct to coordinate or support price increases, the former Vitafoam President instructed his sales people to send copies of their draft price increase letters to competitors.

77.     In addition to discussions the former Vitafoam President had with competitors, the salespeople of Vitafoam also had discussions with the other Defendants concerning price increases and the timing of those increases.  These discussions involved inquiries as to whether each competitor was going to support the price increase, when the price increases were going to be issued and what the effective dates of the increases would be.

78.     The former Vice President and others at Vitafoam also participated in conspiratorial conduct with many individuals employed by numerous companies.

79.     The former vice president of Vitafoam had communications in furtherance of the conspiracy with Defendant Carpenter Group.  They had discussions on multiple occasions involving price increases concerning a shared customer.  In an effort to coordinate their price increases and to make sure those increases went through for the mutual customer, they called each other and sent by fax copies of draft price increase letters.

80.     Valle Foam also communicated with other Defendants – their competitors – by telephone and they also faxed each other copies of their draft price increase letters that would be sent to customers so as to coordinate and collude on price increase percentages and their effective dates.

81.     During the Class Period, Vitafoam employees contacted Carpenter employees regarding price increases and their effective dates.

82.     During the price increase periods, Defendants also agreed to avoid each other's customers and not attempt to take business or market share from one another.

83.     A former Woodbridge employee who was employed in Ontario, Canada, from 1986 until 2009, participated in the conspiracy.  While working at Defendant Woodbridge, this employee served most recently as Vice President of Commercial Sales where he had authority to determine prices.  This former Woodbridge employee is currently employed at Vitafoam as their Vice President of Sales, a position he has held since April 2009.  In his current position, he has authority to determine prices.  The current Vitafoam Vice President, along with other individuals employed by Defendants, has been engaged in a long-running price fixing and customer allocation conspiracy.

84.     This current Vitafoam vice present has engaged in the conspiratorial activity by reaching understandings and agreements on price increases with most of Vitafoam's competitors for the same percentage on the same effective date.  He has had personal involvement in this conduct since the early 1990's when he became involved with pricing at Woodbridge, and this involvement continued when he joined Vitafoam.  This activity involved the U.S. and Canadian markets.  The objective of the price increase scheme was for the conspirators to collectively pass raw material cost increases on to their customers, as well as to maintain their respective market shares.

85.     Participants in this conduct with the current Vitafoam Vice President included Woodbridge, Vitafoam, Foamex, Carpenter, Vitafoam U.S., Future Foam, Hickory Springs, Scottdel, Valle and Flexible Foam.  The Vitafoam Vice President coordinated price increases among competitors, as did counterparts at the competitors.

86.     The current Vitafoam Vice President's discussions relating to coordinating price increases among competitors were conducted primarily by means of telephone, electronic mail, and in-person meetings.   In-person discussions frequently took place at meetings of the Polyurethane Foam Association ("PFA") trade group.

87.     The current Vitafoam Vice President and other participants in this conspiracy took numerous steps to avoid detection of their conspiracy. At times, full names would not be used in correspondence and instead participants would use only first names or initials. Conspirators took advantage of attending the PFA meetings along with their competitors and met to discuss coordinating price increases outside of the formal meetings.  Similarly, competitors visited each other's manufacturing facilities for the purported purpose of sharing technological and operational advances, but were actually using the opportunity to discuss coordinated price increases.  Another method to avoid detection involved going to a local Staples or other office stores to use the public facsimile machines to send each other price increase letters without the company's identifying facsimile transmission banner.

88.     On May 26, 2010, Vice President of Sales for Vitafoam attended a PFA meeting in Baltimore, Maryland.  While there, he discussed foam pricing with competitor Flexible Foam. This conversation included him being asked why Vitafoam was not raising prices or following the increase.

89.     The former Director of Corporate Engineering at Woodbridge is now the President of Vitafoam.  He worked at Woodbridge from 1985 until January 2008.  As the Director of Corporate Engineering, he had authority to determine prices at Woodbridge.  As the President of Vitafoam, a position he has held since August 2008, he now has authority to determine prices at Vitafoam.  He, along with other individuals of defendant companies, also participated in the long-running price fixing and customer allocation conspiracy.

90. Discussions with competitors in the foam industry involving the current President of Vitafoam while he was at Woodbridge, included conversations about legitimate topics like business development or potential joint ventures, and then ultimately led to conspiratorial conversations about price increases. These discussions about coordinating pricing took place during in-person discussions, electronic mail communications and telephone conversations.

91. The current President of Vitafoam individually participated in conspiratorial discussions concerning pricing in the foam industry while at Woodbridge and Vitafoam with various competitors. These discussions led to a clear understanding and agreement that after the participants would discuss the price increases and effective dates, they would then implement increases in accordance with that coordination.

92. Virtually every known price increase, going back to at least 1999 and until Vitafoam's entry into the DOJ leniency program in the industry, has involved conspiratorial discussions among Defendants on pricing. Chemical price increases from the major suppliers were the impetus for these discussions.

93. While at Vitafoam, the current President has received Vitafoam's competitors' draft increase letters from other Vitafoam personnel.

### Efforts to Enforce the Conspiracy

94. Defendants also undertook efforts to police the conspiracy. Participants, including former Vice President of Vitafoam, followed up after discussions with competitors to see if the specific price increases and effective dates were actually being implemented. For example, the Vitafoam Vice President called Valle and Carpenter to see if those competitors were putting the increases through as they had discussed and agreed.

**Industry Meetings**

95.     Representatives of Defendants have regularly met through such organizations as the Polyurethane Foam Association ("PFA"), the International Sleep Products Association ("ISPA"), and the Surfaces, a trade group which includes polyurethane carpet underlay producers.

96.     Defendants were well aware of the risk of anticompetitive conduct at trade association meetings.  For example, the Spray Polyurethane Foam Association ("SPFA") admits that "[t]rade associations must be acutely sensitive to antitrust issues . . . because their meetings also may provide opportunities to reach unlawful agreements."  *See* http://www.sprayfoam.org/index.php?page_id=4487.

97.     Representatives from defendant companies reached illegal agreements at these industry meetings held in the United States and abroad.

98.     Representatives of Defendants used these trade association meetings as nothing more than "meet-and-greet" sessions with their competitors.

99.     Representatives of Defendants disguised their attendance at these events as legitimate "information gathering" sessions, and merely used them as an opportunity to fix prices and divvy up their customers in person.

100.    Representatives of Defendants not only had no intention of learning legitimate facts about the market at these meetings, they essentially controlled the market and attended these meetings to further exercise their control.

**ACTIVE CONCEALMENT AND TOLLING**

101.    Throughout and beyond the conspiracy, Defendants and their co-conspirators affirmatively and actively concealed their unlawful conduct from Plaintiffs.  Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly within the confines

of their higher-level executives.  Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases.  Defendants and their co-conspirators conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively concealed their activities through various other means and methods to avoid detection.  Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws as alleged herein until shortly before this class action litigation was commenced.

102.  Defendants and their co-conspirators engaged in a successful price-fixing and customer allocation conspiracy, which they affirmatively concealed by:

  a.  Meeting secretly (including use of private telephonic communications) to discuss prices, customers, and markets of polyurethane foam sold in the United States  and elsewhere;

  b.  Agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

  c.  Using first names and initials on written communications to disguise their source;

  d.  Holding secret meetings outside and separate from the formal trade association meetings defendants were publicly attending;

  e.  Disguising price-fixing meetings and communications

as technical and operational meetings;

  f.  Using fax machines at publicly available outlets to

    disguise the source of faxes.

103. As a result of the active concealment of the conspiracy by Defendants and their co-conspirators, any and all statutes of limitations otherwise applicable to the allegations herein have been tolled.

## PLAINTIFFS' INJURIES

104. Plaintiffs and the Class members as defined below have been damaged as a direct, foreseeable, and proximate result of Defendants' misconduct.  Plaintiffs and the Class members participate in the market for the sale of polyurethane foam.  To the extent Plaintiffs and Class members purchase polyurethane foam as part of a product purchase, such as mattresses, carpet padding, furniture and spray foam insulation, Defendants' unlawful conspiracy and unfair, deceptive and unconscionable practices have caused the prices at which these products are sold to increase to supra-competitive levels.

105. Defendants have extinguished the market forces of competition to their mutual benefit. Consumers, including Plaintiffs and Class members, were and are injured by paying supra-competitive prices for polyurethane foam.

106. Because Defendants control the market for polyurethane foam, there are virtually no choices for consumers who require products containing polyurethane foam other than buying such products from entities that pay supra-competitive prices to Defendants because of Defendants' unlawful agreement alleged herein.

107. The conspiratorial conduct of Defendants and their co-conspirators, the purpose of which is to raise the price of polyurethane foam, would, on information and belief, directly increase the price of products containing polyurethane foam.  The economic and legal literature

has recognized that unlawful overcharges on a component normally results in higher prices for products that contain that price-fixed component.

108.    During the Class Period, Plaintiffs and the Class members paid supra-competitive prices for polyurethane foam.  These inflated prices have been passed on to them by manufacturers, distributors, and retailers. Those overcharges have unjustly enriched Defendants.

## CLASS ACTION ALLEGATIONS

109.    Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

110.    Plaintiffs bring this suit as a class action under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the members of the Class, comprised of persons who purchased the following products containing polyurethane foam sold by Defendants:  a) mattresses; b) carpet padding; c) furniture; and d) spray foam insulation ("SPF").

111.    The Class consists of:  "All persons and entities residing in the United States who, from January 1, 1999, through the present, indirectly purchased polyurethane foam from Defendants for their own use and not for resale in mattresses, carpet padding, furniture and/or spray foam insulation ("SPF") containing polyurethane foam.  Specifically excluded from this Class are Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant.  Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action."

112.    The Class is ascertainable and there is a well-defined community of interest among the members of the Class.

113.    Based on the nature of the trade and commerce involved and the number of indirect purchasers of polyurethane foam, Plaintiffs believe the members of the Class number in the thousands.

114.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

115.    Members of the Class are identifiable from information and records in the possession of Defendants, and/or from other readily available sources.

116.    There are questions of law and fact common to the Class.  These common questions relate to the existence of the conspiracy alleged, and to the type and common pattern of injury sustained as a result thereof.  The questions include but are not limited to:

      a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize the price charged for polyurethane foam sold in the United States, or allocate the market for polyurethane foam;

      b.    The identity of participants in the conspiracy;

      c.    The operative time period and duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

      d.    Whether the combination or conspiracy caused polyurethane foam prices to be higher than they would have been in the absence of Defendants' conduct  and the effect of Defendants' conspiracy on the prices of polyurethane foam in the United States during

the Class Period; and;

e.  Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and members of the Class;

f.  The appropriate measure of damages suffered by Plaintiffs and other members of the Class;

g.  Whether the alleged conspiracy violated Section 1 of the Sherman Act;

h.  Whether Defendants' conduct violates Sections 16720 and/or 17200 of the California Business and Professions Code;

i.  Whether Defendants' conduct violates the Tennessee Trade Practices Act;

j.  Whether Defendants' conduct violates the antitrust, unfair competition, and consumer protection laws of the other states as alleged below; and

k.  the appropriate nature of class-wide equitable relief.

117.  These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class, including legal and factual issues relating to liability and damages.

118.  Plaintiffs are members of the Class.  Plaintiffs' claims are typical of the claims of other members of the Class, and Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs all bought polyurethane foam indirectly from one or more Defendant or their co-conspirators, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

119.    Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class.   In addition, Plaintiffs are represented by competent counsel experienced in the prosecution of class actions and antitrust litigation.

120.    A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all damaged Class members is impractical.  Prosecution as a class action will eliminate the possibility of repetitious litigation. Further, prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.   Class treatment will also permit the adjudication of relatively small claims by members of the Class who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. Thus, absent the availability of the class action procedure, it would not be feasible for Class members to redress the wrongs done to them.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

121.    Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

122.    In the absence of a class action, Defendants would be unjustly enriched because they would be able to retain the benefits and fruits of their illegal and wrongful conduct.

123.    The claims in this case are also properly certifiable under the laws of the State of California, and of the other individual states identified below in the Second, Third, Fourth and Fifth Counts.

## CLAIMS FOR RELIEF

## COUNT ONE

## VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT AND SECTION 4 OF THE CLAYTON ACT

124. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

125. Beginning at a time presently unknown to Plaintiffs, but at least as early as January 1, 1999, and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for polyurethane foam in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

126. In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

        a.      To fix, raise, maintain and stabilize the price of polyurethane foam;

        b.      To allocate markets for polyurethane foam among themselves;

        c.      To submit rigged bids for the award and performance of certain polyurethane foam contracts; and

        d.      To allocate among themselves the production of polyurethane foam.

127. The combination and conspiracy alleged herein has had the following effects, among others:

        a.      Price competition in the sale of polyurethane foam has been restrained, suppressed, and/or eliminated in the United States;

      b.      Prices for polyurethane foam sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

      c.      Those who purchased polyurethane foam directly or indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

128.    Plaintiffs have been injured and will continue to be injured in their business and property by paying more for polyurethane foam purchased indirectly from Defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy, including paying more for products in which polyurethane foam is a component as a result of higher prices paid for polyurethane foam by the manufacturers of those products.

129.    Plaintiffs and the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT TWO

## VIOLATION OF THE CALIFORNIA CARTWRIGHT ACT

130.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

131.    Beginning at a time presently unknown to Plaintiffs, but at least as early as January 1, 1999, and continuing thereafter to the present, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, polyurethane foam at supra-competitive levels.

132.     The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, polyurethane foam.

133.     For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

     a.     to fix, raise, maintain and stabilize the price of polyurethane foam;

     b.     to allocate markets for polyurethane foam amongst themselves;

     c.     to submit rigged bids for the award and performance of certain polyurethane foam contracts; and

     d.     to allocate among themselves the production of polyurethane foam.

134.     The combination and conspiracy alleged herein has had, inter alia, the following effects:

     a.     price competition in the sale of polyurethane foam has been restrained, suppressed and/or eliminated in the State of California and throughout the United States;

     b.     prices for polyurethane foam sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California and throughout the United States; and

      c.      those who purchased polyurethane foam from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

135.    Plaintiffs and the other members of the Class paid supra-competitive, artificially inflated prices for polyurethane foam.

136.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business and property in that they paid more for polyurethane foam than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

## COUNT THREE

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

137.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

138.    Beginning on a date unknown to Plaintiffs, but at least as early as January 1, 1999, and continuing thereafter to the present, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, et seq. of the California Business and Professions Code, by engaging in the acts and practices specified above.

139.    This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

140. Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, et seq., including, but not limited to, the following:

      a.     The violations of Section 1 of the Sherman Act, as set forth above;

      b.     The violations of Section 16720, et seq., of the California Business and Professions Code, set above;

      c.     Defendants' acts, omissions, misrepresentations, practices and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

      d.     Defendants' act and practices are unfair to consumers of polyurethane foam in the State of California and throughout the United States, within the meaning of Section 17200, California Business and Professions Code; and

      e.     Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

141. Plaintiffs and each of the Class members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business acts or practices.

142.    The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

143.    The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Class to pay supra-competitive and artificially-inflated prices for polyurethane foam.  Plaintiffs and the members of the Class suffered injury in fact and lost money or property as a result of such unfair competition.

144.    The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

145.    As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

## COUNT FOUR

## VIOLATION OF THE TENNESSEE TRADE PRACTICE ACT

146.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

147.    Beginning at a time presently unknown to Plaintiffs, but at least as early as January 1, 1999, and continuing thereafter to the present, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Tennessee Trade Practices Act, T.C.A. §§ 47-25-101, *et. seq.* ("TTPA").  Defendants, and each of them, have acted in violation of the TTPA to fix, raise,

stabilize and maintain prices of, and allocate markets for, polyurethane foam at supra-competitive levels.

148.    The aforesaid violations of the TTPA consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, polyurethane foam.

149.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

      a.      to fix, raise, maintain and stabilize the price of polyurethane foam;

      b.     to allocate markets for polyurethane foam amongst themselves;

      c.      to submit rigged bids for the award and performance of certain polyurethane foam contracts; and

      d.     to allocate among themselves the production of polyurethane foam.

150.    The combination and conspiracy alleged has affected Tennessee trade or commerce to a substantial degree, including but not limited to the following effects:

      a.     price competition in the sale of polyurethane foam has been restrained, suppressed and/or eliminated in the State of Tennessee and throughout the United States;

      b.     prices for polyurethane foam sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of Tennessee and throughout the United States; and

c.      those who purchased polyurethane foam from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

151.    Plaintiffs and the other members of the Class paid supra-competitive, artificially inflated prices for polyurethane foam.

152.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured and/or damaged in their business and property in that they paid more for polyurethane foam than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of the TTPA, Plaintiffs seek damages, including treble damages, and the costs of suit, including reasonable attorneys' fees.

## COUNT FIVE

## VIOLATION OF STATE ANTITRUST AND UNFAIR COMPETITION LAWS

153.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

154.    Defendant's intentional and purposeful anti-competitive acts that are described above, including but not limited to acts of collusion to set prices and the actual act of price fixing itself, were intended to and did cause Plaintiffs and other consumers to pay supra-competitive prices for polyurethane foam products in the indirect purchaser states.

155.    Defendants' monopolistic and anticompetitive acts as described above are in violation of the following states' antitrust laws, which permit private actions by indirect purchasers:

a.      Alabama.  *See* Alabama Code §6-5-60.

b.      Arizona.  *See* Arizona Revised Statutes § 44-1403, *et. seq.  See also*
Arizona Revised Statute §44-1408 and *Bunker's Glass Co. v.*
*Pilkington PLC*, 75 P.3d 99 (Ariz. 2003).

c.      California.  *See* California Business & Professions Code § 16700, *et. seq.*
*See also* Cal. Bus. & Prof. Code §§16720 & 16750(a).

d.      District of Colombia.  *See* District of Columbia Code § 28-4501, *et seq.*

e.      Iowa.   *See* Iowa Code § 553.1, *et. seq.  See also* Iowa Code
§§ 553.5 and 553.12; *Comes v. Microsoft Corp.*, 646 N.W.2d 440
(Iowa 2002).

f.      Kansas.  *See* Kansas Statutes Annotated § 50-101, *et. seq.  See also*
Kansas Statute Annotated § 50-161 and *Four B. Corp. v. Daicel Chem.*
*Indus.*, 253 F. Supp. 2d 1147 (D. Kan. 2003).

g.      Maine.  *See* Maine Revised Statutes Annotated, Title 10 § 1101, *et. seq.*
*See also* Maine Revised Statute Annotated, Title 10, §§ 1102 and 1104
and *McKinnon v. Honeywell Int'l, Inc.*, 977 A.2d 420, 427 (Ma. 2009).

h.      Michigan.  *See* Michigan Compiled Laws § 445.771, *et seq.  See also*
Michigan Compiled Laws § 445.778 and *A & M Supply Co. v. Microsoft*
*Corp.*, 654 N.W.2d 572 (Mich. App. 2002).

i.      Minnesota.  *See* Minnesota Statutes § 325D.51, *et seq.  See also*
Minnesota Statute § 325D.57 and *Lorix v. Crompton Corp.*, 736 N.W.2d
619 (Minn. 2007).

j.      Mississippi.  *See* Mississippi Code Annotated § 75-21-1, *et seq.  See also*
Mississippi Code Annotated § 75-21-9.

k.      Nebraska.  *See* Nebraska Revised Statute § 59-801, *et. seq.  See also*

38

Nebraska Revised Statute 59-821.

l.      Nevada.  *See* Nevada Revised Statutes § 598A.060.

        *See also*  Nevada Revised Statutes §598A.210(2).

m.      New Hampshire.  *See* New Hampshire Revised Statute Annotated §356:1,

        *et. seq.  See also* New Hampshire Revised Statute Annotated §356:11(II).

n.      New Mexico.  *See* New Mexico Statutes § 57-1-1, *et. seq.  See also* New

        Mexico Statutes § 57-1-3(A).

o.      North Carolina.  *See* North Carolina General Statutes § 75-1, *et. seq.  See*

        *also* North Carolina General Statute §75-16 and *Hyde v. Abbott Labs.,* 123

        N.C. App. 572, 584 (N.C. Ct. App. 1996).

p.      North Dakota.  *See* North Dakota Century Code § 51-08.1-01, *et seq.*

        *See also* North Dakota Century Code  §§ 51-08.1-03, 51-08.1-08.

q.      South Dakota.  *See* South Dakota Codified Laws § 37-1-1, *et. seq.*

        *See also* South Dakota Codified Laws §37-1-33.

r.      Tennessee.  *See* T.C.A. §§ 47-25-101, *et. seq.  See also*

        T.C.A. §§ 47-25-106.

s.      Vermont.  *See* Vermont Statutes, Title 9, §2453, *et. seq.  See also*

        Vermont Statutes, Title 9, §§ 2453 and 2465.

t.      Wisconsin.  *See* Wisconsin Statutes §133.01, *et. seq.  See also* Wisconsin

        Statutes §§ 133.03 and 133.18(1)(a).

156.    Plaintiffs and the Class seek actual damages for their injuries caused by these
violations in an amount to be determined at trial.  Plaintiffs and the Class seek treble damages
pursuant to the indirect purchaser states' antitrust laws as stated above where they are allowed by
law.

157.    Defendants' willful and unlawful conduct allow Plaintiffs and the Class to seek attorneys' fees in the indirect purchaser states where they are allowed by law.  Plaintiffs and the Class seek attorneys' fees where they are allowed by law.

## COUNT SIX

## VIOLATION OF STATE CONSUMER PROTECTION STATUTES

158.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

159.    The deceptive practices of Defendants as alleged above include, but are not limited to, collusion between Defendants in setting prices and actual price fixing with the intended purpose to maintain supra-competitive pricing for polyurethane foam product prices charged to consumers (all unknown to the general consumer public).  Defendants' deceptive and anti-competitive conduct resulted in higher consumer prices for polyurethane product prices charged to consumers because of supra-competitive pricing by Defendants.

160.    Defendants' acts as described above are in violation of the following states' consumer protection laws, which permit private actions by indirect purchasers:

a. Alabama.  *See* Alabama Code §6-5-60.

b. Alaska.  *See* Alaska Statutes § 45.50.471, *et seq.  See also* Alaska Statutes §§ 45.50.471 and 45.50.531.

c. California.  *See* California Business & Professions Code § 17200, *et. seq.*

d. District of Colombia.  *See* District of Columbia Code §§ 28-3901, *et. seq.*

e. Florida.  *See* Florida Statutes §§ 501.201, *et. seq.  See also Mack v. Bristol Meyers Squibb Co.*, 673 So.2d 100 (Fla. App. 1996).

f. Maine.  *See* Maine Revised Statutes, Title 5, § 207, *et seq.  See also* Maine Revised Statutes, Title 5, §§ 207 and 213.

g.  Massachusetts.  *See* Massachusetts General Laws Chapter 93A, § 1,

*et. seq*.  *See also* Massachusetts General Laws Chapter 93A, §§ 2 and 9;

*Ciardi v. F. Hoffmann La Roche, Ltd.*, 436 Mass. 53 (Mass. 2002)

h.  Nebraska.  *See* Nebraska Revised Statutes § 59-1601, *et seq*.  *See also*

Nebraska Revised Statutes §§ 59-1603 and 59-1604; *Arthur v.*

*Microsoft Corp.*, 267 Neb. 586; 676 N.W.2d 29 (2004).

i.  New Hampshire.  *See* New Hampshire Revised Statutes § 358-A:2, *et*

*seq*.  *See also* New Hampshire Revised Statutes §§ 358-A:2 and § 358-A-

10; *Lachance v. United States Smokeless Tobacco Co.*, 156 N.H. 88; 931

A.2d 571 (2007).

j.  New Mexico.  *See* New Mexico Statutes § 57-12-1, *et. seq*.  *See also* New

Mexico Statutes §§ 57-12-3 and 57-12-10.

k.  New York.  *See* New York General Business Laws § 349, *et. seq*.

l.  North Carolina.  *See* North Carolina General Statutes § 75-1, *et. seq*.  *See*

*also* North Carolina General Statutes § 75-16.

m.  Utah.  *See* Utah Code § 13-11-1, *et. seq*.

n.  Vermont.  *See* Vermont Statutes, Title 9, § 2451, *et. seq*.

o.  West Virginia.  *See* West Virginia Code § 46A-6-101, *et seq*.  *See*

*also* West Virginia Code §§ 46A-6-104 and 46A-6-106.

161.  Plaintiffs and the Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial.

162.  Defendants' willful and unlawful conduct allow Plaintiffs and the Class to seek attorneys' fees in the consumer protection states where they are allowed by law.  Therefore, Plaintiffs and the Class seek attorneys' fees where they are allowed by law.

## COUNT SEVEN

## UNJUST ENRICHMENT AND DISGORGEMENT OF PROFITS

163.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

164.     Defendants have been unjustly enriched through overpayments by Plaintiffs and Class members and the resulting profits enjoyed by Defendants as a direct result of such overpayments.  Plaintiffs' detriment and Defendants' enrichment were related to and flowed from the conduct challenged in this Complaint.

165.     Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred via overpayments by Plaintiffs and Class members.

166.     Plaintiffs and members of the Class seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and Class members may seek restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

A.     That the Court determine that the claims alleged herein under the Sherman Act, state antitrust laws, and state consumer protection and/or unfair competition laws may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

B.     That the unlawful agreement, conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

1.     A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief;

2.      An unlawful combination, trust, agreement, understanding, and/or concert

of action in violation of the state antitrust laws identified in the Second

and Fourth and Fifth Claims for Relief herein;

3.      Violations of the state consumer protection and unfair competition laws

identified in the Third and Sixth Claims for Relief herein; and

4.      Acts of unjust enrichment as set forth in the Seventh Claim for Relief

herein.

C.      That Plaintiffs and the Class members recover damages, as provided by federal and state antitrust laws, and that a judgment be entered in favor of Plaintiffs and the relevant Class members against Defendants, jointly and severally, in an amount to be trebled in accordance with such laws where permitted.

D.      That Plaintiffs and the relevant Class members obtain any penalties, punitive or exemplary damages, and/or full consideration, where the laws of the respective states identified herein so permit;

E.      That Plaintiffs and the relevant Class members recover damages and/or all other available monetary and equitable remedies under the state unfair competition laws identified above;

F.      That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G.     That Plaintiffs and members of the Class be awarded restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unfair competition and acts of unjust enrichment;

H.     That Plaintiffs and members of the Class be awarded pre- and post-judgment interest, and that that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

I.     That Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

J.     That Plaintiffs and members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial of all issues triable by jury.

Respectfully submitted,

DICKINSON WRIGHT PLLC

By: s/ William M. Thacker
          William M. Thacker, OH Bar #0067847
          301 E. Liberty Street, Suite 500
          Ann Arbor, MI  48104-2266
          Phone:  (734) 623-7075
          Fax:  (734) 623-1625
          wthacker@dickinsonwright.com

By:  /s/ Martin D. Holmes
          Martin D. Holmes, TN Bar #012122
          Fifth Third Center, Suite 1401
          424 Church Street
          Nashville, TN 37219
          Phone:  (615) 244-6538
          Fax:  (615) 256-8386
          mdholmes@dickinsonwright.com
          (*Pro Hac Vice* Admisssion Pending)

By:  /s/ M. Reid Estes, Jr.

     M. Reid Estes, Jr., TN Bar # 009043
     Fifth Third Center, Suite 1401
     424 Church Street
     Nashville, TN 37219
     Phone:  (615) 244-6538
     Fax:  (615) 256-8386
     restes@dickinsonwright.com
     (*Pro Hac Vice* Admission Pending)

     *Attorneys for Plaintiffs and the Proposed
     Class*

NASHVILLE 99999-100 403650